UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| JOSEPH HAMILTON,<br><br>Plaintiff,<br><br>v.<br><br>DURHAM SCHOOL SERVICES, LP, NATIONAL EXPRESS LLC, and HIRERIGHT HOLDINGS CORPORATION d/b/a HIRERIGHT, LLC, jointly and severally,<br><br>Defendants. | Case No. ___________<br><br>Hon. ______________<br>United States District Judge |

**COMPLAINT FOR MONEY DAMAGES AND INJUNCTIVE RELIEF, AND JURY DEMAND**

Joseph Hamilton, by his attorneys, Complains of Durham School Services, LP, National Express, LLC, and Hireright, LLC as follows.

**Parties, Jurisdiction, and Venue**

1. Joseph Hamilton is a 65-year-old man who lives and works in New Mexico.
2. Durham School Services, LP, doing business as Durham School Services, is a transportation company registered to do business in Michigan with its principal place of business in Illinois.

3. National Express, LLP is a national transportation company that wholly owns Durham School Services, LP and is registered to conduct business in Michigan. It is incorporated in Delaware and has its principal place of business in Illinois.
4. HireRight Holdings Corporation, doing business in Michigan as HireRight, LLC, is an entity incorporated in Delaware and has its principal place of business in Tennessee.
5. On July 27, 2021, Plaintiff Joseph Hamilton timely filed a charge with the EEOC alleging violations of the Americans with Disabilities Act, both discrimination and retaliation, by Defendant Durham School Services.
6. On June 14, 2023, the EEOC issued a Notice of his Right to Sue on his charge, 471-2021-02068.
7. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, which authorizes federal courts to decide cases concerning federal questions, and 28 U.S.C. §§ 1343(a)(3) and (4), which authorize federal courts to hear civil rights cases.
8. The matter in controversy exceeds $75,000 in value.
9. The parties being citizens of different states and the matter in controversy exceeding $75,000, this Court also has jurisdiction over all claims pursuant to 28 U.S.C. § 1332.

10. The core facts and allegations of this matter took place in the Eastern District of Michigan and Defendants are all registered to conduct business in Michigan; therefore, venue is proper in this Court.

**FACTUAL ALLEGATIONS**

11. Joseph Hamilton is a 65-year-old man in good health.

12. Mr. Hamilton has a mild form of cerebral palsy ("CP") that manifests itself as slight deformities on his left hand and left foot—both are slightly smaller and less agile than his right hand and right foot but otherwise of adequate strength for an adult male.

13. Mr. Hamilton has never considered his CP to constitute a handicap, disability or impairment in any way.

14. Joseph Hamilton was employed to drive school buses for the Ann Arbor Public Schools from 2013 until 2021.

15. Between 2013 and 2015, Mr. Hamilton was employed directly by the Ann Arbor Public Schools in his capacity as a bus driver.

16. After 2015, Ann Arbor Public Schools engaged Defendant Durham School Services to provide its transportation services.

17. From 2015 until 2021, Mr. Hamilton was employed by Durham School Services, a wholly owned subsidiary of Defendant National Express, in the same capacity—a school bus driver.

18. At all times between 2013 and 2021, Mr. Hamilton complied with the Depart of Transportation's ("DOT") requirements for maintaining the Commercial Driver's License ("CDL") necessary to operate a school bus.

19. As part of the DOT's requirements for a CDL, Mr. Hamilton underwent biannual medical certifications.

20. In 2015 when Durham School Services took on Mr. Hamilton as an employee, it had a third-party employment screening agency, TalentWise, screen Mr. Hamilton, and Mr. Hamilton passed that screening.

21. Between 2015 and 2020, Durham School Services conducted periodic driver evaluations and these always resulted in positive conclusions for Mr. Hamilton.

22. In 2018, Mr. Hamilton received Durham School Services' safety award for driving excellence.

23. Between 2015 and 2021, Mr. Hamilton prepared several medical forms for each of his biannual CDL renewals and these forms ask the applicant to indicate whether they have had any of a list of 32 injuries, disabilities, or impairments, including "19. Missing or limited use of arm, hand, finger, leg, foot, toe."

24. This form also asks the applicant to provide further comment on any of these 32 items for which they provided a "yes" answer.

25. Mr. Hamilton provided further explanation regarding his mild from of CP.

26. Mr. Hamilton would then report to a medical clinic selected by Durham School Services for a physical examination.

27. The regular process for these biannual medical examinations is for the physician to review the medical form completed by the driver, conduct a physical examination, and then complete and sign the medical form and provided a medical certification for the driver to submit to his employer.

28. The medical form includes a place for the physician to indicate whether the CDL applicant could be approved based on that examination alone, or whether the applicant required a Skills Performance Evaluation (SPE) Certificate from the DOT to be certified.

29. An SPE Certificate "allows drivers with missing or impaired limbs to drive CMVs across state lines if they have been fitted with (and are wearing) the right prosthetic device, and the driver can demonstrate the ability to drive the truck safely by completing on-and off-road activities. If the driver passes the driving test, he or she will receive a SPE certificate. Over the years, FMCSA has granted more than 3,000 SPE certificates to truck drivers who have shown that they can drive safely on the nation's highways."[1]

[1] Federal Motor Carrier Safety Administration, "Skill Performance Evaluation Certificate Program", https://www.fmcsa.dot.gov/medical/driver-medical-

30. Mr. Hamilton is not fitted with a prosthetic device, is not missing any limbs, and has never experienced any impairment that would prevent him from operating a motor vehicle.

31. Under the Department of Transportation Regulations governing commercial drivers, a driver is physically qualified to drive a commercial motor vehicle of that person, *inter alia*, (1) has no loss of a foot, a leg, a hand, or an arm, or has been granted a skill performance evaluation certificate pursuant to § 391.49; (2) Has no impairment of: (i) A hand or finger which interferes with prehension or power grasping; or (ii) An arm, foot, or leg w*hich interferes with the ability to perform normal tasks associated with operating a commercial motor vehicle*; or any other significant limb defect or limitation *which interferes with the ability to perform normal tasks associated with operating a commercial motor vehicle*; or has been granted a skill performance evaluation certificate pursuant to § 391.49. 49 C.F.R. § 391.41(b)(1)-(2) (emphasis added).

32. Mr. Hamilton has no condition that interferes with his prehension or grasping, nor with any task associated with operating a motor vehicle.

---

requirements/skill-performance-evaluation-certificate-program (last visited July 19, 2022).

33. Mr. Hamilton provided signed medical forms for his CDL renewal in 2015, 2017, 2019, and February of 2021.

34. On each of these forms, he checked of "yes" for the box "Missing or limited use of arm, hand, finger, leg, foot, toe" and then provided the additional comment that he had CP-related mild deformity to his left hand and foot, but that he had sufficient strength for wheel and pedal controls.

35. As a driver for the Ann Arbor Public Schools and for Durham School Services, Mr. Hamilton only ever operated buses with automatic transmissions; therefore, only his right foot is used to operate the pedals.

36. On each of these Medical Forms and the Certificates between 2015 and 2021 issued by the examining physician from the clinic selected by Durham School Services, the physicians acknowledged Mr. Hamilton's left hand and foot conditions but always checked the box that he was cleared to operate.

37. None of these physicians ever checked the box that Mr. Hamilton required an SPE or otherwise indicated the Mr. Hamilton had any impairment interfering with any task required to operate a motor vehicle.

38. On February 2, 2021, Mr. Hamilton completed the same process he had completed on all prior occasions between 2015 and 2021: he appeared for his mandatory biannual physical at the clinic selected by Durham School Services

for his examination—and submitted to a full physical exam by Dr. Joseph Valle.

39. Dr. Valle reviewed the DOT Medical Form Mr. Hamilton had completed, indicated that Mr. Hamilton met the physical standards of 49 CFR 391.41 to qualify for a 2-year certificate, and signed the Medical form.

40. Dr. Valle then issued Mr. Hamilton a Medical Examiner's Certificate indicating only that Mr. Hamilton must wear corrective lenses, and certified Mr. Hamilton through February 2, 2023.

41. On this February 2, 2023, report, Dr. Valle noted Mr. Hamilton's "flexion contracture of LIF and left foot" but nonetheless cleared him as "meets the standards in 49 CFR 391.41" and qualified him for a 2-year certification.

42. The report allows the doctor to indicate that the driver with any limitation could be qualified for a shorter period of time or defer the driver's qualification pending some condition, but Dr. Valle elected and signed off on a full and unconditional qualification.

43. That same day, Mr. Hamilton submitted the signed medical form and medical certificate to Durham School Services.

44. In 2015, 2017, and 2019, when Mr. Hamilton submitted his prior Medical Form and Medical Examiner's Certificate to Durham School Services, it

accepted the form, his CDL remained active, and he continued as a bus driver for Durham School Services without interruption.

45. However, in February of 2021, Durham School Services rejected Mr. Hamilton's Medical Form and Medical Examiner's Certificate and began to treat him with disdain, humiliate him, and bar him from driving a school bus because they suddenly saw him as a person with a disability even though he has no impairment and was fully qualified and medically certified to drive a school bus.

46. Instead of accepting the Medical Examination Certificate as had been done in the past, Durham School Services shared Mr. Hamilton's medical documents with HireRight, Durham School's third-party screening agency.

47. HireRight immediately flagged Mr. Hamilton to Durham School Services as medically disqualified due to the statement on these medical forms that he had cerebral palsy.

48. HireRight instructed Durham School Services to require Mr. Hamilton to undergo an SPE because his medical form said "cerebral palsy" on it.

49. HireRight made this determination without conducting its own physical examination of Mr. Hamilton.

50. HireRight made this determination without speaking to Dr. Valle who examined Mr. Hamilton.

51. HireRight made this determination without reviewing any other medical records for Mr. Hamilton.

52. Rather, HireRight saw the term "cerebral palsy" on the Medical Examination Form and Certificate and made the uninformed assumption, based on stereotypes rather than any individualized assessment of Mr. Hamilton, that he would not and could not be qualified to operate a bus because he had CP.

53. HireRight made this uninformed assumption about Mr. Hamilton even though 49 CFR 391.41, the federal regulation governing the physical qualification for drivers, contains no per-se disqualification for CP or indicates the requirement of an SPE for this condition.

54. Indeed, every statement within 49 CFR 391.41 regarding the physical qualifications of drivers states that a condition, including neuromuscular conditions like CP, is only disqualifying if it interferes with the driver's ability to operate, control, or drive a commercial motor vehicle safely.

55. Durham School Services, for whom Mr. Hamilton had operated a school bus over six years without incident, did not rely on any individualized assessment of Mr. Hamilton's abilities and instead adopted HireRight's uninformed, stereotyped assumptions as its own decision.

56. On February 3, 2021[2], the day after Mr. Hamilton submitted his paperwork, Cheri Henrion, the Safety Supervisor for Durham School Services, contacted Mr. Hamilton to inform him that HireRight insisted to Durham School Services that he get an SPE in order to renew his license because he had cerebral palsy.

57. On February 4, 2021, Mr. Hamilton contacted the regional office of the DOT in Chicago and left a message requesting an SPE application.

58. On February 18, 2021, Mr. Hamilton received the SPE application packet and researched available Orthopedic surgeons who could provide this examination.

59. On February 25, 2021, Mr. Hamilton was examined by Dr. Donald E. Wild, who wrote in his findings on the Medical Form:

    "Patient is in no way limited on function of his [left] side and [left] lower extremity. Patient has no problem driving a motor vehicle and is able to do all tasks required of him working as a driver."[3]

60. Dr. Wild amended the report on April 22, 2021 to add:

[2] There is a discrepancy on when this notification happened. Plaintiff recalls that this took place on February 3, 2021, while Defendant Durham School Services states that the HireRight review and information back to Mr. Hamilton took place on February 4, 2021.

[3] Dr. Wild mistakenly wrote "right" not left on the form and amended the form on March 19, 2021 to correct that error.

"Pt. has a life long limitation of his L side including both his arm and leg. He has adapted effectively and is able to perform all of his functional needs independently. This includes driving a school bus which he has done effectively in the past. I see no limitation that prevents him from performing duties required."

61. Mr. Hamilton completed the SPE application provided by the DOT, including Dr. Wild's report, and mailed it to the DOT.

62. In March, the DOT called Mr. Hamilton to explain that the form was deficient because Dr. Wild had not checked off the box on the form indicating that an SPE was necessary.

63. Dr. Wild had not checked that box because, as he indicated on his report, Mr. Hamilton was able to operate a school bus without any adaptations and he did not believe that Mr. Hamilton required an SPE.

64. The DOT explained to Mr. Hamilton that it cannot conduct an SPE unless the examining physician indicates that an SPE is necessary.

65. Mr. Hamilton then called Durham School Services and left a message for its national human resources department explaining that the DOT would not conduct an SPE because the examining physician had not indicated that one was necessary.

66. Durham School Services local supervisor Ed Gallagher ("Gallagher") and its National Safety Director Ron Limbach ("Limbach") then spoke with Mr. Hamilton by phone and said that HireRight's "medical review" of his file led to the determination that the SPE was required.

67. Gallagher and Limbach further asked for an additional personal statement by Dr. Wild regarding Mr. Hamilton's ability to safely operate a school bus.

68. Mr. Hamilton explained to Gallagher and Limbach that he has never considered his CP a disability and it has never affected his health, nor has he ever required any medical treatment for his CP.

69. Furthermore, neither Dr. Valle nor Dr. Wild, nor the physicians who conducted Mr. Hamilton's medical examinations in 2015, 2017, and 2019 ever stated any concerns about Mr. Hamilton's CP or his ability to operate a school bus.

70. Nonetheless, Durham School Services imposed on Mr. Hamilton unnecessary conditions of employment because of the perception by HireRight and Durham School Services that he had a disability.

71. On March 24, 2021, the first day back at school fafter the pandemic shutdown, Gallagher intercepted Mr. Hamilton at the front door and informed him that he was not cleared to drive.

72. Gallagher further informed Mr. Hamilton that Durham was waiting on a response from the DOT, and that until this was resolved, he would ride along on the route, not driving, while a substitute drove the bus.

73. Mr. Hamilton, an experienced and competent bus driver, was humiliated by being forced to ride as a passenger on a bus while another driver operated the bus.

74. On March 26, 2021, Gallagher confirmed that Mr. Hamilton remained barred from driving a bus and told him to complete a new CDL application.

75. On March 29, 2021, Gallagher spoke with the DOT and learned that because the physician had not checked the box indicating an SPE was necessary, Mr. Hamilton was cleared to drive.

76. Gallagher relayed this information to Limbach, who continued to insist that the DOT requires an SPE because Mr. Hamilton had cerebral palsy.

77. On March 30, Limbach and Gallagher again met with Mr. Hamilton, resulting in Gallagher instructing Mr. Hamilton to return to Concentra with Cheri Henrion of the local Durham School Services office and demanding that the physician indicate on the form that the SPE was required.

78. Additionally, Durham School Services informed Mr. Hamilton that he would have to restart the SPE application process over, even though he had already submitted an entire application to the DOT.

79. On April 20, 2021, Durham School Services provided Mr. Hamilton with the application to complete.

80. However, this application form was not the same as the one the DOT had provided to Mr. Hamilton.

81. The key difference between the SPE application Durham School Services required Mr. Hamilton to complete and the one the DOT had provided to him in February was that this application was for a *new* driver and required that Mr. Hamilton take a full road test.

82. Mr. Hamilton, as a driver already licensed, only needed to complete a renewing driver SPE application.

83. The SPE application for a renewing driver requires only 8 items, while the SPE application for a new driver requires 9 items, the additional item being "7. A copy of the road test and road test certificate or a copy of both sides of your commercial driver's license (CDL)."

84. Not only had Durham School Services, on the uninformed assessment of HireRight, demanded Mr. Hamilton take an SPE that his examining physician did not believe was necessary, but it also sought to impose on him the burden of taking a driving test as if he were a new driver, rather than have him complete the application for a renewing driver, which does not have a road-test component.

85. The road test for a new driver is a very demanding and difficult to pass—it requires many steps and processes that new CDL applicants spend a long time studying and preparing for.

86. A renewing driver, unless they train other drivers, would not be in a position to pass this test without taking time off to study.

87. Durham School Services not only unfairly imposed on Mr. Hamilton a new-driver road test but also did not give him an opportunity to study for this difficult test.

88. Nonetheless, Mr. Hamilton dutifully attempted to take this road test, even as he complained to his supervisor and others at Durham School Services that it was unfair and he was unprepared for such a test.

89. Mr. Hamilton emailed and asked for an explanation for why Durham School Services was requiring him to take a road test, but he received no response.

90. On May 13, 2021, Mr. Hamilton—who had not driven a school bus in 15 months due to the COVID-19 school closings and then Durham School Services' unlawful refusal to allow him to drive once the schools reopened—made a mistake early in the test and did not pass.

91. Mr. Hamilton was very upset and humiliated by being forced to take this road test, which was not designed for an experienced driver.

92. Additionally, Durham School Services rejected Mr. Hamilton's medical report from Dr. Wild and demanded that he go to a different orthopedic surgeon for evaluation.

93. On May 12, Mr. Hamilton made an appointment with Dr. Hyman, a physician whose office was a 65-mile roundtrip from Mr. Hamilton's home.

94. On May 17, 2021, Mr. Hamilton received his third medical examination in 2021 from Dr. Hyman and presented it to Durham School Services.

95. After these humiliations, Mr. Hamilton filed grievances with his union regarding Durham School Services's unfair treatment of him.

96. On July 20, 2021, he filed a charge with the EEOC for unlawful discrimination under the ADA.

97. On August 11, 2021, Linbach informed Mr. Hamilton on a call with union representatives, Gallagher, and Henrion, that Durham would only resolve his union grievances if he withdrew his EEOC charge.

98. This statement constitutes unlawful interference with Mr. Hamilton's efforts to vindicate his rights under the ADA.

99. The union rejected this demand and the meeting ended with Mr. Hamilton being reinstated with seniority as a driver, except that Mr. Hamilton would still need to submit another SPE application.

100. In the meantime, Mr. Hamilton was still not allowed to operate a bus.

101. Rather, Durham continued to humiliate Mr. Hamilton by having him ride on the school bus as a passenger while a substitute driver actually operated the bus.

102. Mr. Hamilton subsequently revised his charges to the EEOC to add unlawful retaliation against him for having asserted his rights under the ADA.

103. Also on August 11, 2021, Durham informed Mr. Hamilton that he was required to undergo now a *fourth* medical examination, this time arranged by HireRight.

104. On August 13, 2021, Mr. Hamilton underwent a medical examination at a Concentra facility in Woodhaven, MI, that required a 90-mile roundtrip drive.

105. Dr. Calder Conner performed this examination and, just every other physician to examine Mr. Hamilton since 2015, did not check off the box indicating that an SPE was necessary.

106. On the long drive out to the Concetra clinic in Woodhaven, Mr. Hamilton was frustrated and extremely distressed because of the blatantly unfair treatment by Durham School Services.

107. Mr. Hamilton had been treating for emotional distress since his medical certification had first been rejected earlier that year.

108. Furthermore, Mr. Hamilton has never considered his CP to constitute a disability or limitation in any way.

109. Being so exasperated by his employer's insistence on his undergoing and SPE and knowing that no other physician had ever found him to be disabled or impaired, Mr. Hamilton did not check off the box on his Medical form indicating "19. Missing or limited use of arm, hand, finger, leg, foot, toe."

110. Mr. Hamilton thought that since he has all his limbs and his CP does not limit his activities of daily living, and since the CP was causing such problems for his employment, he would not indicate the CP on his medical form and see whether that change would resolve the stressful, six months of contention over his CDL renewal.

111. But Durham School Services finally had its "gotcha" moment to justify ousting Mr. Hamilton both because it did not want an employee it perceived to be disabled operating a school bus and as retaliation for Mr. Hamilton's having exercised his rights under the ADA to file a charge of discrimination with the ADA.

112. On August 27, 2021, Durham School Services put Mr. Hamilton on administrative leave supposedly because he had "falsified" his medical record.

113. On September 15, 2021, Durham School Services terminated Mr. Hamilton's employment supposedly because he had "falsified" his medical record.

114. This reason for his termination is pretext for the discriminatory animus Durham School Services had demonstrated for six months by refusing to accept the fact that Mr. Hamilton had no disability or impairment and was perfectly qualified to operate a school bus.

115. This reason is also pretext for retaliation, as Durham School Services had already indicated to Mr. Hamilton in front of others its displeasure at him for filing a charge with the EEOC.

116. Mr. Hamilton had listed his CP on every medical form prior to August of 2021, including the three prior medical examinations in 2021, and by August of 2021, and Durham School Services had access to every one of these forms.

117. What's more, at no time prior to HireRight's screening in 2021 did Durham School Services ever question Mr. Hamilton's fitness to operate a school bus.

118. Mr. Hamilton has subsequently found work as a school bus driver, first for another school system in Michigan and then in New Mexico, where he still

works as a school bus driver; however, he earns far less than he did working for Durham School Services.

119. In addition to significant economic losses, Mr. Hamilton suffered emotional distress and extreme humiliation because of Durham School Services and HireRight's bias against him because they perceived him to be disabled.

**COUNT 1: DISCRIMINATORY MEDICAL EXAMINATIONS IN VIOLATION OF THE ADA, 42 U.S.C. § 12112**
**(against Durham School Services and National Express)**

120. Plaintiff incorporates the above allegations by reference here.

121. Defendants are employers as defined by the A.D.A.

122. Mr. Hamilton is a qualified individual with a disability as defined in the ADA at 42 U.S.C. § 12102 (1) (c) because he was regarded by his Employer as an individual with a disability.

123. 42 U.S.C. § 12112(d)(4)(A) prohibits medical examinations and inquiries into an individual's disability, "unless such examination or inquiry is shown to be job-related and consistent with business necessity."

124. Durham School Services, based on a superficial and uninformed "screening" from HireRight determined that Mr. Hamilton's CP—a condition that imposes no impairments or limitations on him—"medically disqualified" him from operating a school bus.

125. Mr. Hamilton had operated buses for Durham School Services for years without incident; therefore, Durham School Services had no job-related reason consistent with business necessity to believe that Mr. Hamilton required an SPE to be able to continue to work as a bus driver.

126. Defendants then used HireRight's superficial and uninformed assessment as a false basis to require Mr. Hamilton to go through three unnecessary medical examinations.

127. Defendant did not require additional medical examinations for any other similarly situated individual—other individuals who have adequate grip strength and function in their limbs to operate a bus.

128. There was no business necessity for Mr. Hamilton's three additional examinations imposed on him by Defendants in 2021 because his first examination in February 2021 was conducted by a physician at the Concentra clinic Defendant had directed him to go to for that examination.

129. Defendants unlawfully discriminated against Mr. Hamilton because of an actual or perceived disability when it imposed on him these extra medical examinations that were redundant and therefore not job-related or a business necessity.

130. Defendants unlawfully discriminated against Mr. Hamilton when they barred him from operating a school bus because it regarded him as a person with a disability.

131. As a result of Defendants' unlawful acts, Mr. Hamilton has and will in the future experience economic and non-economic losses. His non-economic losses include emotional distress, embarrassment, loss of reputation, hurt feelings, mental anguish, sleep disturbances, a loss of self-confidence and an abiding sense of outrage about the behavior of the Employer's representatives responsible for this attack on his civil rights.

## COUNT 2: DISPARATE TREATMENT BECAUSE OF DISABILITY IN VIOLATION OF THE ADA, 42 U.S.C. § 12112 (against Durham School Services and National Express)

132. Plaintiff incorporates the above allegations by reference here.

133. Durham School Services and National Express are employers as defined by the A.D.A.

134. Mr. Hamilton is a qualified individual with a disability as defined in the ADA at 42 U.S.C. § 12102 (1) (c) because even though he does not have a disability, he was regarded by his employer as an individual with a disability.

135. The ADA prohibits employers from disparate, adverse treatment of an employee because of his perceived or actual disability.

136. The three additional medical examinations Defendants ordered for Mr. Hamilton confirmed what the first medical examination indicated—that Mr. Hamilton has no conditions limiting his ability to perform his job as a bus driver.

137. Defendants rejected the results of Mr. Hamilton's first and three subsequent medical examinations and persisted in regarding him as having a disability.

138. Defendants imposed an unnecessary road test, which Mr. Hamilton was likely to fail, because they perceived him to have a disability.

139. Defendants did not require other bus drivers to undergo repeated medical examinations or unnecessary road tests.

140. Because they regarded Mr. Hamilton as having a disability, Defendants kept insisting on additional medical examinations in order to obtain a result that would require him to undergo an unnecessary SPE, which is only required for individuals who are missing a limb and use a prosthesis.

141. Because they regarded Mr. Hamilton as having a disability and wished to terminate his employment, Defendants knowingly required Mr. Hamilton to complete a new-driver's SPE application, rather than a renewing driver's application, so that he would have to take—and likely fail—a road test, which

is never required for renewing drivers and can only be passed after significant study and preparation.

142. Defendants were determined to prevent Mr. Hamilton to continue operating a school bus because they perceived him as disabled.

143. Defendants repeatedly rejected Mr. Hamilton's multiple medical examinations and complaints of unfairness in order to force him to make a mistake that would give them a pretextual "justification" to terminate his employment.

144. In fact, Defendants terminated Mr. Hamilton because they perceived him to be disabled.

145. Mr. Hamilton readily found employment with other school districts as a bus driver, further demonstrating that he has never had any impairment or disability that would prevent him from obtaining a CDL or operating a school bus.

146. As a result of Defendants' unlawful acts, Mr. Hamilton has and will in the future experience economic and non-economic losses. The non-economic losses include emotional distress, embarrassment, loss of reputation, hurt feelings, mental anguish, sleep disturbances, a loss of self-confidence and an abiding sense of outrage about the behavior of the Employer's representatives responsible for this attack on her civil rights.

**COUNT 3: DISCRIMINATORY MEDICAL EXAMINATION IN VIOLATION OF THE PERSONS WITH DISABILITIES CIVIL RIGHTS ACT, M.C.L. §§ 37.1101 ET SEQ**
**(against all Defendants)**

147. Plaintiff incorporates the above allegations by reference here.

148. Defendants are covered as employers under the PWDCRA.

149. HireRight is an employer as defined by the PWDCRA and acted at all times as an agent of Durham School Services and National Express.

150. Mr. Hamilton is a qualified individual with a disability as defined in the PWDCRA, MCL 37.1103(d)(iii), because Defendants regarded him as someone with a disability even though he has no disability.

151. The PWCDRA, MCL 37.1202(1)(d), prohibits medical examinations and inquiries into an individual's disability, "that are not directly related to the requirements of the specific job."

152. HireRight conducted a superficial, incorrect and uninformed "screening" that Mr. Hamilton's CP—a condition that imposes no impairments or limitations on him—"medically disqualified" him from operating a school bus.

153. Mr. Hamilton had operated buses for Durham School Services for years without incident and passed his February 2021 medical screening; therefore, Durham School Services had no job-related reason consistent with business

necessity to believe that Mr. Hamilton required an SPE to be able to continue to work as a bus driver.

154. The Federal Regulations governing the physical qualifications for commercial drivers do not require a driver, merely because he has CP, to undergo an SPE; rather, these regulations at 49 CFR 391.41 state that a driver is fit unless they have a condition that impairs or limits their ability to operate a vehicle safely.

155. Mr. Hamilton has no condition that impairs or limits his ability to operate a motor vehicle safely.

156. Defendants used this superficial and uninformed assessment to create a false basis to require Mr. Hamilton to go through three unnecessary medical examinations.

157. Defendant did not require additional medical examinations for any other similarly situated individuals—other individuals who have adequate grip strength and function in their limbs to operate a bus.

158. There was no business necessity for Mr. Hamilton's three additional examinations imposed on him by Defendants in 2021 because his first examination in February 2021 was conducted by a physician at the Concentra clinic Defendant had directed him to go to for that examination.

159. Defendants unlawfully discriminated against Mr. Hamilton because of an actual or perceived disability when it imposed on him these extra medical examinations that were redundant and therefore not job-related or a business necessity.

160. Defendants unlawfully discriminated against Mr. Hamilton when they barred him from operating a school bus because it regarded him as a person with a disability.

161. As a result of Defendants' unlawful acts, Mr. Hamilton has and will in the future experience economic and non-economic losses. His non-economic losses include emotional distress, embarrassment, loss of reputation, hurt feelings, mental anguish, sleep disturbances, a loss of self-confidence and an abiding sense of outrage about the behavior of the Employer's representatives responsible for this attack on his civil rights.

**COUNT 4: DISPARATE TREATMENT IN VIOLATION OF MICHIGAN'S PERSONS WITH DISABILITIES CIVIL RIGHTS ACT**
**(against all Defendants)**

162. Plaintiff incorporates the above allegations by reference here.

163. Durham School Services and National Express are covered as an employer under the PWDCRA.

164. HireRight in an employer as defined by the PWDCRA and at all times acted as an agent of Durham School Services and National Express by

conducting employee screening on their behalf; therefore, it is also covered under the PWDCRA.

165. Mr. Hamilton is a qualified individual with a disability as defined in the PWDCRA because even though he does not have a disability, he was regarded by his employer as an individual with a disability.

166. The PWDCRA prohibits employers from disparate, adverse treatment of an employee because of his perceived or actual disability.

167. The PWDCRA prohibits employers from "limit[ing], segregate[ing], or classify[ing] an employee or applicant for employment in a way which deprives or tends to deprive an individual of employment opportunities or otherwise adversely affects the status of an employee because of a disability or genetic information that is unrelated to the individual's ability to perform the duties of a particular job or position." MCL 37.1202(c).

168. HireRight violated the PWDCRA by improperly segregating and classifying Mr. Hamilton as someone who could not be permitted to operate a motor vehicle without an SPE, even though he has no condition that impairs or interferes with his ability to operate a motor vehicle.

169. The three additional medical examinations Defendants ordered for Mr. Hamilton confirmed what the first medical examination indicated—that Mr.

Hamilton has no conditions limiting his ability to perform his job as a bus driver.

170. Defendants classified Mr. Hamilton as someone with CP—what they perceived as a disability—and then, because of that classification refused to allow him to drive a bus.

171. Defendants rejected the results of Mr. Hamilton's first three subsequent medical examinations and persisted in regarding him as having a disability.

172. Defendants imposed an unnecessary road test, which Mr. Hamilton was likely to fail, on Mr. Hamilton because they perceived him to have a disability.

173. Because they regarded Mr. Hamilton as having a disability, Defendants kept insisting on additional medical examinations in order to obtain a result that would require him to undergo an unnecessary SPE, which is only required for individuals who are missing a limb and use a prosthesis.

174. Because they regarded Mr. Hamilton as having a disability and wished to terminate his employment, Defendants knowingly required Mr. Hamilton to complete a new-driver's SPE application, rather than a renewing driver's application, so that he would have to take—and likely fail—a road test, which is never required for renewing drivers and can only be passed after significant study and preparation.

175. Defendants were determined to prevent Mr. Hamilton to continue operating a school bus because they perceived him as disabled.

176. Defendants repeatedly rejected Mr. Hamilton's multiple medical examinations and complaints of unfairness in order to force him to make a mistake that would give them a pretextual "justification" to terminate his employment.

177. Defendants did not treat other bus drivers who had passed their medical screening in the adverse way they treated Mr. Hamilton.

178. Defendants terminated Mr. Hamilton because they perceived him to be disabled.

179. Mr. Hamilton readily found employment with other school districts as a bus driver, further demonstrating that he has never had any impairment or disability that would prevent him from obtaining a CDL or operating a school bus.

180. As a result of Defendants' unlawful acts, Mr. Hamilton has and will in the future experience economic and non-economic losses. The non-economic losses include emotional distress, embarrassment, loss of reputation, hurt feelings, mental anguish, sleep disturbances, a loss of self-confidence and an abiding sense of outrage about the behavior of the Employer's representatives responsible for this attack on her civil rights.

**COUNT 5: RETALIATION IN VIOLATION OF THE ADA**
**(against Durham School Services and National Express)**

181. Plaintiff incorporates all allegations above by reference here.

182. On July 27, 2021, Mr. Hamilton filed a charge of disability discrimination against his employer with the EEOC.

183. The ADA, 42 U.S.C. § 12203, prohibits retaliation against an employee who has exercised of his rights under the ADA, which includes filing a charge of discrimination with the EEOC.

184. Furthermore, employers may not interfere with an employee's right to file a charge with the EEOC or require an employee to withdraw a charge he has filed with the EEOC.

185. Shortly after Mr. Hamilton filed his charge with the EEOC, Durham School Services acknowledged to Mr. Hamilton that it knew of the EEOC charge he filed and demanded that he drop the charge in order to be reinstated as a bus driver.

186. Defendants also required Mr. Hamilton to take another medical examination in order to be reinstated as a bus driver.

187. Defendants subsequently used Mr. Hamilton's medical form in which he did not list his CP, which has never imposed any impairment to him, as a pretext to terminate his employment.

188. In fact, Defendants terminated Mr. Hamilton's employment in retaliation for his having filed charges with the EEOC.

189. As a result of Defendants' willfully unlawful acts, Mr. Hamilton has and will in the future experience economic and non-economic losses. The non-economic losses include emotional distress, embarrassment, loss of reputation, hurt feelings, mental anguish, sleep disturbances, a loss of self-confidence and an abiding sense of outrage about the behavior of the Employer's representatives responsible for this attack on her civil rights.

**COUNT 6: RETALIATION IN VIOLATION OF THE PWDCRA**
**(against Durham School Services and National Express)**

190. Plaintiff incorporates all allegations above by reference here.

191. On July 27, 2021, Mr. Hamilton filed a charge of disability discrimination against his employer with the EEOC, which is a protected act under the PWDCRA.

192. The PWDCRA prohibits employers from interfering with an individual's efforts to exercise their rights under the Act and/or retaliating against an individual for exercising his rights under the Act.

193. Mr. Hamilton had expressed to his employer on multiple occasions in 2021 that he was being treated unfairly because he was perceived to have a disability.

194. Shortly after Mr. Hamilton filed his charge with the EEOC, Durham School Services acknowledged to Mr. Hamilton that it knew of the EEOC charge he filed and demanded that he drop the charge in order to be reinstated as a bus driver.

195. Defendants also required Mr. Hamilton to take another medical examination in order to be reinstated as a bus driver.

196. Defendants subsequently used Mr. Hamilton's medical form in which he did not list his CP, which has never imposed any impairment to him, as a pretext to terminate his employment.

197. In fact, Defendants terminated Mr. Hamilton's employment in retaliation for his having complained of unfair treatment because of his perceived disability and for having filed a charge with the EEOC.

198. As a result of Defendants' unlawful acts, Mr. Hamilton has and will in the future experience economic and non-economic losses. The non-economic losses include emotional distress, embarrassment, loss of reputation, hurt feelings, mental anguish, sleep disturbances, a loss of self-confidence and an abiding sense of outrage about the behavior of the Employer's representatives responsible for this attack on her civil rights.

## REQUEST FOR RELIEF

As alleged above, Defendants have violated Plaintiff's rights under several laws; therefore, Plaintiff requests the following relief:

A. An Order Declaring that Defendants have violated Plaintiff's rights under the ADA and the PWDCRA:

B. Award Plaintiff the full measure of his economic damages arising from Defendants' unlawful conduct;

C. Award Plaintiff future wages and other economic damages arising from Defendants' unlawful conduct;

D. Award Plaintiff compensatory damages arising from Defendants' unlawful conduct;

E. Award Plaintiff punitive damages because of Defendants' knowing, blatant, and outrageous conduct in violation of the ADA;

F. Award Plaintiff his reasonable attorney's fees and costs; and

G. Any other relief the Court deems just.

Respectfully Submitted by:

/s/Robin B. Wagner
Robin B. Wagner (P79408)
Jennifer L. Lord (P46912)
Pitt McGehee Palmer Bonanni & Rivers, PC
Attorneys for Plaintiff
117 W. 4th Street

Suite 200
Royal Oak, MI 48067
248-398-9800
rwagner@pittlawpc.com
jlord@pittlawpc.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| JOSEPH HAMILTON,<br><br>Plaintiff,<br><br>v.<br><br>DURHAM SCHOOL SERVICES, LP, NATIONAL EXPRESS LLC, and HIRERIGHT HOLDINGS CORPORATION d/b/a HIRERIGHT, LLC, jointly and severally,<br><br>Defendants. | Case No. ___________<br><br>Hon. ______________<br>United States District Judge |

**<u>JURY DEMAND</u>**

Plaintiff Joseph Hamilton hereby respectfully requests that this matter be tried before a jury.

Respectfully Submitted by:

/s/Robin B. Wagner (P79408)
Pitt McGehee Palmer Bonanni & Rivers, PC
Attorneys for Plaintiff
117 W. 4th Street
Suite 200
Royal Oak, MI 48067
248-398-9800
rwagner@pittlawpc.com